UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
PLAZA DE RETIRO, INC.
    Debtor.                      No. 11-09-10974 SA

**MEMORANDUM OPINION ON UNITED STATES
TRUSTEE'S MOTION TO APPOINT TRUSTEE**

This matter came before the Court for five days of trial on the United States Trustee's Motion to Appoint a Chapter 11 Trustee ("Motion")(doc 72).  The United States Trustee appeared through its attorney Alice Nystel-Page.  Debtor appeared through its attorney William Davis.  The Unsecured Creditors Committee ("UCC") supported the Motion and appeared through its attorney Walter Reardon.  This is a core proceeding.  28 U.S.C. § 157(b)(2)(A).  For the reasons set forth below, the Court finds that the Motion is well taken and should be granted.

**FACTS**

Debtor was incorporated in New Mexico in 1976.  The Debtor is licensed to be and in fact does operate a continuing care facility[1] located in Taos, New Mexico.  The facility includes

---

[1]    All retirement communities in New Mexico that undertake to provide "independent living and health or health-related services," § 24-17-3(C), for a fee, are subject to the Continuing Care Act. See §§ 24-17-2 to -3. The Continuing Care Act was designed to "provide for disclosure and the inclusion of certain information in continuing care contracts in order that residents may make informed decisions concerning continuing care and to provide protection for residents and communities." Section 24-17-2(B). Toward that
                                  (continued...)

approximately sixty-four (64) residential units, a dining hall, administration building, and a 20-bed on-site medical facility. The facility serves approximately six-five (65) elderly residents. The Debtor has a Home Health Care License and is licensed as a Skilled Nursing Facility. Debtor is a "health care business" as defined in 11 U.S.C. § 101(27A).

John Himes and Lucy Himes formed the Debtor and operated it from 1976 to 1993. The original facility consisted of the "Main" tract and the "Brandenburg" tract. In 2002 Debtor acquired the "Pond" tract. There are 59 living units on the Main and Brandenburg tracts and 5 living units on the Pond tract. William Himes is the son of John and Lucy Himes; he came to work at the Debtor in December 1998. William Himes holds a bachelor's degree in biology and biochemistry. In May 1999 he obtained a nursing home administrator's license. William Himes has worked full-time as manager of the Debtor since 1999. He is also the Debtor's President. The Himes family owns 797,929 of the 1,147,045 outstanding shares of the Debtor's common stock.

Each of the residents resides in either a residential living unit or in the medical facility, pursuant to a contract called

---

[1](...continued)
    end, the Continuing Care Act mandates that
    certain information must be disclosed in all
    contracts between continuing care facilities
    and their residents. See id.
Bishop v. Evangelical Good Samaritan Soc., ___P.3d___, 2009 WL 2170430 at *1, 2009-NMSC-036 at {2} (2009).

either a "Continuing Care Contract" ("CCC") or a "Resident Agreement" ("RA") providing for life occupancy privileges. Under the CCC an incoming resident pays a substantial[2] "entrance fee" and thereafter a monthly service fee. Residents under an RA do not pay an entrance fee, but pay monthly service fees. The Debtor provides the residents with a living unit and related services, such as laundry and utilities. The Debtor also provides the residents with nursing service for emergency calls from the resident's living unit, basic physical check-ups upon request, and if ordered by a physician, admittance to a semi-private room in the medical facility or the provision of required nursing care in the living unit. Typically the nursing facility is fully occupied or nearly so, and on March 31, 2009 had 13 residents.

Debtor employs approximately 30 people. Debtor also pays two independent contractors for other services, such as nursing.

In October, 2008, Debtor's management called a meeting with the residents and informed them of the financial crisis it was in. The residents were shocked and extremely distressed. For many, their CCC with Plaza de Retiro represented their most significant asset. Most had planned to live out their retirements at Plaza de Retiro and now worried they would have to

_____

[2]An expert witness testified that these fees range from $50,000 to $1,000,000 depending on the region of the county, with Debtor's fee running $200,000 to $300,000. Exhibit 3, p. 4.

move. This meeting started the distrust the residents now have of management and its ability to carry on the business or reorganize. That distrust has grown to the point that the residents are fearful generally, anxiety-ridden, fearful of retaliation and feel they have little or no control over their lives or their futures. In particular, the residents generally distrust William Himes. The Court finds that the acrimony has grown to the point that an independent third party is necessary for this Debtor to survive and reorganize.

In December, 2008, Debtor's four insurance policies were cancelled for nonpayment. The insurance documents were apparently accidentally omitted from the Initial Report (doc 44, filed March 26, 2009), but were attached to an Amendment filed on April 8, 2009 (doc 55). The § 341 first meeting of creditors was held on April 9, 2009. William Himes testified on behalf of the Debtor at the meeting. Twice he was asked about insurance coverage and twice he responded that insurance was in effect. Exhibit 65, p. 14, l. 7 and p. 23, l. 18. At trial, Mr. Himes testified that the first he knew of the insurance lapse was in mid-April, after the § 341 meeting, when the insurance agent called him on the telephone. He claims to have not seen or been aware of Exhibits 16 through 19[3], which are: Notice of Intent to

---

[3]Debbie Feese, Debtor's bookkeeper up until after the bankruptcy filing, testified to the contrary. She recalled
(continued...)

Page -4-

Cancel dated 12/11/08 from First Insurance Funding Corp. (Exhibit 16, stating that insurance will be cancelled on 12/21/08), Fax dated 12/17/08 from Deb Feese at Retiro to Alix Linnartz at Brown & Brown Insurance (Exhibit 17, listing actual payments made), Fax dated 12/18/08 from Alix Linnartz to Deb Feese and William Himes (Exhibit 18, stating that the first payment due on September 1, 2008 had never been paid to Brown & Brown) or 4 Notices of Cancellation respectively of each of Debtor's four insurance policies, effective 12/23/08 (Exhibits 19a-d). The Court does not find this credible. It is inconceivable to the Court that even if Mr. Himes did not see the Notice of Intent to Cancel, either because it was mis-addressed or lost when slid under his office door, that someone would not have mentioned it to him before mid-April. It is further incredible because the Monthly Operating Reports for March, 2009 and April, 2009 and the Amended April, 2009 all show that no insurance payments had been made during those months. Any competent management would have been aware of or alerted to the fact that crucial insurance payments

_____

[3](...continued)
receiving Exhibit 16, identified her handwriting on it, and recalled telling William Himes about it on the day she received it. She recalled seeing the fax from Brown & Brown in December, 2008. She recalled Debtor being "way behind" on insurance at the time. She claims that Debtor had been "warned" with notices and phone calls. She recalls giving the Notices of Cancellation to William Himes the first week in January, 2009, perhaps by slipping them under the door. She had a conversation with him after that and told him "Our insurance was cancelled" and he replied "No it wasn't". She did not believe him, however.

Page -5-

of almost $6,000 were not being made on a monthly basis.  On the other hand, if it is true then there is a very serious communication problem within management that needs to be remedied.  Fortunately for all involved, the insurance was reinstated without lapse in coverage on May 8, 2009.  (Exhibit C-2-1).  Mr. Himes testified that he did not know why the insurance was reinstated.  The Court found a $12,000 payment for insurance on the May, 2009 Monthly Operating Report, which it believes is the reason for reinstatement.

The majority of Debtor's income comes from entrance fees and monthly service fees.  To date, Debtor's business model was to use both of these fees as current income.  Debtor did not maintain any percentage of the entrance fees as a reserve for future needs.  Consequently, there are currently no cash reserves to cover shortfalls.[4]  The Court finds it unlikely that any new resident would knowingly[5] enter into a CCC with Debtor under the

---

[4]Mr. John Ward Himes testified that at one point years ago Debtor had over $240,000 in cash in a local financial institution which he withdrew shortly before the institution collapsed.  He then invested those funds in real estate for the business, and that real estate accumulated over the years is essentially the reserves.  There was no evidence that even suggested that the real estate was so valuable that it could serve as a reserve.  Rather, the purpose of the real estate purchases over the years was to expand the business.

[5]The New Mexico Continuing Care Act, N.M. Stat. Ann. § 24-17-1 et seq. contains a fairly extensive disclosure requirement.  See N.M. Stat. Ann. § 24-17-4.  From the testimony presented at trial, the Court finds that compliance with the disclosure
(continued...)

current circumstances, which would be the equivalent of buying a large and expensive insurance policy from an insolvent insurance company that had few assets. See Michael D. Floyd, Should Government Regulate the Financial Management of Continuing Care Retirement Communities?, 1 Elder L. J. 29, 37 (1993)(hereafter, "Floyd, Should Government Regulate")("Often the future guarantee of nursing care is at least partially paid for in advance, in the fees paid by the residents. To this extent, therefore, the residents' fees represent a form of insurance premium.")

UST Exhibit 12 consists of the Debtor's audited 2003 financial statements. Prior to and during 2003 Debtor kept its books according to generally accepted accounting principles ("GAAP"). The December 31, 2003 balance sheet included a liability for "Deferred revenue" of $2,525,337 which were fees paid by a resident upon entering into a continuing care contract, net of the portion thereof that is refundable to the resident, which are amortized to income using the straight-line method over the estimated remaining life expectancy of the resident. Exhibit 12, p. 7. The balance sheet indicated Debtor's liabilities

---

[5](...continued)
requirements was the exception rather than the rule. Several residents testified that they were not given a financial statement or tax return before signing their contracts; Mr. Himes' testimony did not dispute this fact. Rather, he stated that prospective residents were offered the financials, but they did not want them. Merely offering them, however, violates the statute which requires them to be actually given.

exceeded its assets by $1,220,824 and the Statement of Operations indicated that Debtor had suffered a $338,834 loss from operations in calendar year 2003.

Among the UST's exhibits were compiled financial statements and tax returns for the Debtor for the years ending 2005, 2006 and 2007. The Debtor's Disclosure Statement has the 2008 tax return as an attachment. For these years, Debtor maintained its books on the income tax basis of accounting, which is a comprehensive basis of accounting other than GAAP. Notably, the income tax basis of accounting does not reflect deferred revenues, because income is recognized on a cash basis. These exhibits show:

| Exhibits | Year | Net Income | Cash Flow | Taxable Before NOL |
|----------|------|------------|-----------|--------------------|
| 6, 9 | 2005 | (630,781) | (57,068) | (620,060) |
| 7, 10 | 2006 | 91,296 | 36,462 | 97,556 |
| 8*, 11 | 2007 | (252,164) | (34,553) | (246,216) |
| Doc 154 | 2008 | 420,362 | (52,957)** | 422,096 |

* The 2007 financial statement accountant's letter contains a "going concern" paragraph which warns the reader that Plaza de Retiro may be unable to continue as a going concern or be able to meet its obligations as they come due without a substantial disposal of assets, restructuring of debt or a forced revision of its operations.
** Computed by comparing opening cash balance to ending cash balance on Schedule L of tax return. The Court is unaware if a 2008 financial statement was prepared. No evidence was presented how Debtor's cash flow could have been -$52,957 in a year that it showed a profit of $420,362.

Finances for the period of January 1, 2009 through March 11, 2009 (petition date) are reflected in the Initial Report (doc 44). The Court has little faith in the financial statements attached to the Initial Report. First, the balance sheet does not balance. It shows total assets of $3,369,482.02 and total liabilities and equity of $3,408,311.13, a difference of $38,829.11. The balance sheet discloses a net loss for the period of ($81,414,95), but the profit and loss statement shows net income of $10,534.50. The December 31, 2008 retained earnings on the tax return were ($873,396); the retained earnings on the Initial Report balance sheet are $24,699.06, which implies income of $898,095.06 for the period January 1 to March 11. In summary, they are just wrong.

Exhibits 22 through 27 consist of Debtor's Monthly Operating Reports and amendments thereto filed in the case. The Court briefly reviewed the earlier ones, intending to rely on the cumulative figures in the June report. In the earlier reports the Court found attachments, presumably printed out from the accounting system. Some stated "cash basis" on the top, some stated "accrual basis" on the top. This cannot be right.

Exhibit 25 is the May 1 to May 31, 2009 operating report. An attachment to it is a monthly profit and loss statement from March 11 through the end of May, 2009. Exhibit 25 (doc 117) p. 55. Exhibit 27 is the June, 2009 operating report. An

attachment to it is a profit and loss statement for the month of June, 2009. Exhibit 27 (doc 168) p. 20-21. These statements show that the Debtor is continuing to lose money in the Chapter 11 case:

| For the period: | Amount of loss |
|---|---|
| March 11 to March 31, 2009 | $          20,705.00 |
| April 1 to April 30, 2009 | $          26,786.00 |
| May 1 to May 31, 2009 | $           5,854.00 |
| June 1 to June 30, 2009 | $          20,338.00 |
| Total | $          73,683.00 |

Other significant figures from the June, 2009 operating report are 1) an ending cash balance of ($39,516.44) and 2) post-petition unpaid unsecured debt of $55,187.98. The first number indicates that Debtor has been writing checks with money it does not have. Perhaps Debtor is attempting to use the "float", but apparently this is not working; Debtor bounced 9 checks in May, 2009 and 21 in June, 2009. A well managed company should rarely, if ever, bounce checks. This practice has cost the Debtor over $1,000 in unnecessary bank charges. As to the second number, it shows that Debtor is building up new debt that is probably administrative debt that would have to be paid before any payments would be made to unsecured creditors[6]. It indicates a

---

[6]And, Debtor's Plan (doc 153) proposes to pay $360,000 total to cover administrative, priority, and unsecured claims. So, every dollar of post-petition administrative debt comes out of
(continued...)

Case 09-10974-trc11    Doc 218    Filed 08/13/09    Entered 08/13/09 10:34:25 Page 10 of 22

problem.  Further, if Debtor is on the cash basis of accounting, these expenses have not yet passed through the income statement because they remain unpaid.  This would indicate that in reality Debtor's March 11 to June 30 loss was $128,871.

Debtor filed its voluntary Chapter 11 petition with this Court on March 11, 2009.  On March 16, 2009 Debtor gave notice to the residents that the Debtor was temporarily ceasing medical care and would close the nursing facility on April 16, 2009.  On March 31, 2009 Debtor filed a Motion for Authority to Reject Executory Contracts with Residents and to Cease Provision of Medical Services, Including Closing the Debtor's Nursing Facility.  Doc 50.  This motion stated the Debtor's intention to permanently close the medical facility, stated that the Debtor was losing approximately $15,000 per month from the medical facility, and stated that the Debtor could not continue to sustain these losses and reorganize.  The notice and filing of the motion caused extreme stress and anxiety on the part of the residents.  Several of them testified that the main reason they joined Plaza de Retiro was the availability of the medical center.

On July 7, 2009, Debtor filed a Plan and a Disclosure Statement (docs 153 and 154).  Among other things, the Plan

---

[6](...continued)
the pockets of the unsecured creditors.

states an intention to reject existing CCC and RA contracts which would then be replaced by similar contracts with modified price terms. (Doc 153, ¶ 4.1(a)). It also states that "if confirmed, the Debtor would continue the operations of the Medical Facility." Id. The Plan is funded by 60 payments of $6,000.00 per month to be used for administrative claims, priority claims and unsecured claims. Id., ¶ 5.1. The Debtor estimates that approximately $300,000 would be available for the unsecured claims. (Doc 154, p. 10). Neither the Plan nor the Disclosure Statement deal with or even recognize the liability for deferred revenues that last appeared on the audited financial statement for year 2003. That liability still exists, but no evidence suggested what it may now be. The UCC's attorney commented that he believed it would be in excess of $7 million, but the Court does not so find. The Plan calls for the common stock equity holders to retain their interests. Id., p. 11.

Professor Nathalie Martin testified as the UST's expert witness on all legal matters related to continuing care facilities, including their bankruptcies, and all business practices related to them, including practices related to admissions fees. Her expert report, as redacted through evidentiary challenges, appears as Exhibit 3. A continuing care contract is designed to control health care costs and provide living space. In general, she feels that continuing care

facilities should be regulated, or, for New Mexico, more regulated.  In her opinion, entrance fees (which are generally nonrefundable) should be actuarially computed based on factors such as age, sex, and health.  The function of these fees is to cover future health care, so the fees should be drawn on over the resident's lifetime to help ensure that there will be money there when needed for the health care.  Accord, Floyd, Should Government Regulate, 1 Elder L. J. at 42 ("To the extent that such advance payments are received, some mechanism must be established to insure that the money actually will be available at the time the prepaid service is to be provided." and Id. at 43 ("A properly managed CCRC will build up a reserve to cover the costs of each resident's later years of residence, which are likely to be much more expensive than the early years due to greater needs for nursing care.")  Debtor does not compute its entrance fees actuarially.  Debtor also maintains no reserves for payment of future health care for the residents.  Prof. Martin's opinion is that failure to maintain reserves is per se gross mismanagement.  Her opinion is based on the belief that if management cannot provide the main service for which they have contracted, management has grossly mismanaged the business.  On cross examination, she admitted that no provision of New Mexico law requires reserves, but nevertheless believed that the business had been mismanaged.  After hearing this entire trial

Case 09-10974-trc11    Doc 218    Filed 08/13/09    Entered 08/13/09 10:34:25 Page 13 of 22

and the opinions of the various experts, and finding that Prof. Martin's report is a concise, logical, and well-thought out and well-presented report, the Court agrees with Prof. Martin's conclusions. Among other things, the Court finds that merely because a certain action (e.g., maintaining sufficient cash reserves) is not mandated by statute does not mean that a debtor can fail to take the action without that failure to act constituting gross mismanagement.

Fred Winter, Debtor's former accountant testified. His firm performed the audits of the financial statements through 2003, and assisted in the compilations done for later years. He confirmed that Debtor followed GAAP through 2003, but stopped after that when the law changed in 2005 making audited financial statements unnecessary. Part of GAAP is SOP 90-8, promulgated by the American Institute of Certified Public Accountants. This principle was issued in 1990 after a study of best practices for continuing care facilities. SOP 90-8 requires the acknowledgment of a liability for unprovided services, thereby allocating front end fees over actuarially computed lives. The Court finds that even though SOP 90-8 is not a required practice, it is a prudent and best practice that should have been and should be followed, and the failure to do that constitutes gross mismanagement.

**CONCLUSIONS OF LAW**

Case 09-10974-trc11    Doc 218    Filed 08/13/09    Entered 08/13/09 10:34:25 Page 14 of 22

Appointment of a Chapter 11 trustee is governed by 11 U.S.C. § 1104, which provides in part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

Under subsection a(1), appointment is mandatory when cause is found. Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.), 838 F.2d 1133, 1136 (10th Cir. 1988)(Once cause is found the Court has no discretion and must appoint a trustee.) Subsection (a)(2) contains a flexible standard that allows a court look to the practical realities and necessities and appoint a trustee when it is in everyone's best interests. In re Marvel Entertainment Group, Inc., 140 F.3d 463, 474 (3rd Cir. 1998); In re Colorado-Ute Electric Assn., Inc., 120 B.R. 164, 176 (Bankr.

Page -15-

D. Colo. 1990).  Under 1104(a)(2) the court should consider 4

factors:

> (I) the trustworthiness of the debtor;
> (ii) the debtor in possession's past and present
> performance and prospects for the debtor's
> rehabilitation;
> (iii) the confidence-or lack thereof-of the business
> community and of creditors in present management;
> (iv) the benefits derived by the appointment of a
> trustee, balanced against the costs of appointment.

Id. (citing In re Ionosphere Clubs, Inc., 113 B.R. 164, 168

(Bankr. S.D. N.Y. 1990)(citations omitted)).

> In determining whether a § 1104 appointment is
> warranted or in the best interests of creditors, the
> bankruptcy court must bear in mind that the appointment
> of a trustee "may impose a substantial financial burden
> on a hard pressed debtor seeking relief under the
> Bankruptcy Code," by incurring the expenditure of
> "substantial administrative expenses" caused by further
> delay in the bankruptcy proceedings.

In re Bayou Group, LLC, 564 F.3d 541, 546-47 (2nd Cir. 2009)

(citing Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re

Anchorage Boat Sales, Inc.), 4 B.R. 635, 644 (Bankr. E.D. N.Y.

1980)).[7]

  With these factors in mind, the Court should also take into

account that there is a strong presumption that a debtor should

normally remain in possession and that appointment of a trustee

---

[7]On the other hand, § 1104(a)(1) would not seem to admit of
that consideration if the court finds "cause" for the appointment
of a trustee.  The Court need not and does not address that issue
in this opinion.

is an "extraordinary" remedy[8]. <u>In re Sundale, Ltd.</u>, 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009). <u>See also</u> <u>In re The 1031 Tax Group, LLC</u>, 374 B.R. 78, 85 (Bankr. S.D. N.Y. 2007)(same.)

Finally, the decision to appoint a trustee is fact intensive and must be made on a case by case basis. <u>Sundale</u>, 400 B.R. at 901. The Court's task is to determine whether the totality of the circumstances warrant appointment of a trustee. <u>Id.</u>

The Court has observed that acrimony between a debtor-in-possession's management and the creditors that impedes the reorganization effort has routinely been found to constitute a ground for appointing a trustee. <u>See</u> <u>Marvel Entertainment</u>, 140 F.3d at 473 ("The district court concluded that 'there is no reasonable likelihood of any cooperation between the parties in the near future.'" ... [T]he district court did not clearly err ... when it found a deep conflict to exist between the ... debtor-in-possession and the creditors in bankruptcy.") (Appointing trustee); <u>Petit v. New England Mortgage Services, Inc. (In re Petit)</u>, 182 B.R. 64, 70 (D. Me. 1995)("[D]eep-seeded

---

[8]In connection with categorizing the appointment of a trustee as "extraordinary", courts usually state that to overcome the presumption the movant must prove cause by clear and convincing evidence. <u>See</u> <u>Bayou Group</u>, 564 F.3d at 546, <u>Marvel Entertainment Group</u>, 140 F.3d at 471. <u>But see</u> <u>Tradex Corp. v. Morse (In re Tradex)</u>, 339 B.R. 823, 829-32 (D. Mass. 2006) (Rejecting the clear and convincing standard and adopting preponderance of evidence standard.) The Tenth Circuit has not ruled on this issue, but the Court finds that in this case either standard would be met.

conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee.")(Appointing trustee)(Citing [In re V.] Savino [Oil & Heating Co., Inc.], 99 B.R. [518] at 526 n.11 [(Bankr. E.D. N.Y. 1989)]); In re The Bible Speaks, 74 B.R. 511, 513 (Bankr. D. Mass. 1987)("The need for a neutral party to mediate disputes between the debtor and its creditors is ground for a trustee's appointment.")(Appointing trustee)(Citing In re Bonded Mailings, Inc., 20 B.R. 781 (E.D. N.Y. 1982)).

Another independent ground for appointing a trustee is either a perceived dishonesty or withholding of information or a debtor's inability to provide accurate records and reports.

> "One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." Savino, 99 B.R. at 526 . Consequently, "[w]here, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." Id.; see In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir.1988) ("It is also established that failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee."); [In re ]Ford, 36 B.R. [501] at 504 [(Bankr. D. Ky. 1983)]("Inherent in debtor's fiduciary obligations under the Code is the duty to file accurate financial reports disclosing all transactions involving estate assets.... Any failure to file accurate financial statements is an omission contributing to cause for appointment of a trustee."); see also Sanders, 2000 WL 329574, at *4, 2000 Bankr. 263, at *11 ("Where a debtor fails to disclose material information to the Court and to the creditors, the appointment of a chapter 11 trustee is appropriate. Misrepresenting the facts of a

Case 09-10974-trc11    Doc 218    Filed 08/13/09    Entered 08/13/09 10:34:25 Page 18 of 22

debtor's financial situation constitutes grounds for
the appointment of a trustee.").
　　More particularly, a failure to provide accurate
schedules to the court has been deemed sufficient
"cause" under § 1104(a)(1). See Sanders, 2000 WL
329574, 2000 Bankr. 263; see also [In re] Deena
Packaging [Industries, Inc.], 29 B.R. at 707 ("Section
1104 ... specifically proscribes certain conduct by
debtors in possession; dishonesty is one such
enumerated, prohibited act.... [T]he trial record
reveals that Deena's failure to include relevant
financial data on their original and amended schedules
raises questions of dishonest conduct.").

Tradex Corp. 339 B.R. at 833.　See also New England Mortgage, 182

B.R. at 69-70 ("Open, honest and straightforward disclosure to

the Court and creditors is intrinsic to the entire reorganization

process. ... Therefore, where the Debtor fails to disclose

material and relevant information to the Court and creditors, a

Chapter 11 trustee is required.")(Citing Savino, 99 B.R. at

526)(Internal punctuation omitted.)　And see In re Sharon Steel

Corp., 871 F.2d 1217, 1228 n.15 (3rd Cir. 1989)("The trustee and

the committee also cite a number of cases maintaining that

inaccurate, incomplete recordkeeping alone amounts to cause

requiring appointment of a trustee under 11 U.S.C. §

1104(a)(1).")(Collecting cases.)

　　Next, the Court will apply the law, in turn, to the facts

discussed above.　First, the Court finds the conflicts with the

residents so severe and the loss of respect so great that an

independent third party is necessary for the Debtor to survive

and reorganize.

Page -19-

Second, cancelled insurance documents[9] were presented to the Court and creditors in the initial report amendment and at the § 341 meeting.  The Court did not find William Himes' explanation/excuses credible.  His handling of this matter on the witness stand, coupled with directly conflicting testimony, put his general credibility in doubt.  As discussed in the text above, the Court finds that the insurance lapse and subsequent concealment was gross mismanagement at best or a lie at worst.

Third, Debtor's business model for the Plan is fundamentally unchanged from their pre-petition model, which did not work.  It appears to the Court that simply raising monthly fees will not do it.  Furthermore, as discussed above, the Court thinks it unlikely that Debtor will get any new business unless the model is changed substantially.  Therefore, for the purpose of this Motion only, the Court finds that the Plan on file is not

---

[9]A failure to maintain insurance also constitutes "cause" to dismiss or convert a case under 11 U.S.C. § 1112(b)(4)(C) so is also automatically a ground to appoint a trustee under § 1104(a)(3).

Case 09-10974-trc11    Doc 218    Filed 08/13/09    Entered 08/13/09 10:34:25 Page 20 of 22

feasible[10].  A trustee is needed to propose a feasible plan that complies with Title 11.

Fourth, there are no cash reserves to provide the care for which the residents contracted.  This is gross mismanagement.

Fifth, Debtor's continuing sales of CCC contracts after the 2003 audit (which showed insolvency and continuing losses) verges on the fraudulent.  Debtor was selling that which it knew or should have known it could not supply: lifetime medical care for elderly persons.  However, even if it is not fraudulent it was dishonest.  This dishonestly apparently continues to today.  This is a ground to appoint a trustee under 11 U.S.C. § 1104(a)(1).

Sixth, the initial report's financial statement and the Monthly Operating Reports contain so many errors and inconsistencies that their value is questionable.  This is a ground for a trustee.  Furthermore, even if inaccurate, the

---

[10]It also appears that the Plan is unconfirmable as violative of the absolute priority rule, which allows confirmation over an objecting class of creditors only if it is "fair and equitable."  See 11 U.S.C. § 1129(b)(1).  A plan is "fair and equitable" with respect to an unsecured creditor only if:
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
11 U.S.C. § 1129(b)(2)(B).  In Debtor's plan, common stockholders retain their stock upon the unsecured creditors receiving a portion of the $360,000 plan payments.

Case 09-10974-trc11   Doc 218   Filed 08/13/09   Entered 08/13/09 10:34:25 Page 21 of 22

Monthly Operating Reports show continuing losses to the estate. Continuing losses, combined with other factors already listed above, are grounds to convert or dismiss a case under § 1112(b)(3)(A), so are grounds to appoint a trustee under 11 U.S.C. § 1104(a)(3).

Seventh, bouncing checks is gross mismanagement.

Eighth, Debtor's communications with residents over the past 9 months, _e.g.,_ closing the medical center then changing directions, have added to the uncertainty in the residents' lives and increased their distrust of the management.

For these reasons, the Court finds that the United States Trustee's Motion to Appoint a Chapter 11 Trustee are well taken. A separate Order granting the Motion will be entered.

_____
Honorable James S. Starzynski
United States Bankruptcy Judge

Date entered on docket: August 13, 2009

Copies to:

William F. Davis
Attorney for Debtor
6709 Academy NE, Suite A
Albuquerque, NM 87109

Walter L Reardon, Jr
Attorney for the UCC
3733 Eubank Blvd NE
Albuquerque, NM 87111-3536

Alice Nystel Page
Office of the UST
PO Box 608
Albuquerque, NM 87103-0608

Case 09-10974-trc11   Doc 218   Filed 08/13/09   Entered 08/13/09 10:34:25 Page 22 of 22