In re:

PLAZA DE RETIRO, INC.

    Debtor.                                  No. 11-09-10974 SA

**MEMORANDUM OPINION IN SUPPORT OF ORDER
APPROVING BORROWING UNDER §364(d)**

Trustee's motions for borrowing under §364(d) (docs 247 and 264) and the objections thereto of post petition secured creditor William Himes (respectively docs 266 and 276) and construction lien claimant R.F. Gallegos Construction, Inc. (respectively docs 263 and 273) came before the Court for a trial on October 22-23, 2009. The Court will grant the motions on the terms set out in the motions for the borrowing of $100,000 by Centinel Bank.[1]

**Background**

This is a trusteed chapter 11 case. Trustee originally filed her motion (doc 247) seeking authority to borrow $200,000 from St. Andrews Ventures, Ltd., to sustain the operations of the continuing care retirement community Plaza de Retiro until she could obtain confirmation of a plan (doc 283; disclosure

---

[1] This Court has jurisdiction of the subject matter and of the parties herein by virtue of 28 U.S.C. §§1334 and 157; this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D), and these are findings of fact and conclusions of law as may be required by Fed.R.Bankr.P. 7052.

Page 1 of 19

statement docs 284 and 285).[2] The first motion was amended/supplemented by the second motion (doc 264), in which the Trustee sought instead to borrow $100,000 from Centinel Bank. Zions First National Bank, Mission Oaks National Bank, R.F. Gallegos Construction, Inc. and William Himes all objected. Trustee and the two other banks reached a settlement essentially granting those banks the potential stay relief similar to that to be granted to Centinel, and so Zion's and Mission Oaks withdrew their objections.[3]

The borrowing terms include giving Centinel a non-primeable first lien on the so-called Pond property, and it is the granting of the priming lien that has occasioned the dispute.[4] Centinel already had the first lien on the property (actually the first two positions, not accounting for any claim for real estate taxes, for its two mortgages) totaling approximately $550,000. Gallegos Construction has the second position based on a prepetition construction lien in a claimed amount of about $191,000. The third position is that of Mr. Himes, who asserts a

---

[2] Interested party SBSEA Ventures, LLC has also filed a plan and disclosure statement. Docs 288 and 289. Objections to both disclosure statements are due on November 24, 2009 and the hearing on objections to both is scheduled for December 10, 2009.

[3] The Court made no ruling at trial, nor does it rule now, on whether such an agreement for stay relief needs to be noticed out to creditors pursuant to Fed.R.Bankr.P. 4001(d).

[4] Other provisions of the proposed borrowing order include that this new loan could not be primed or modified.

Case 09-10974-trc11    Doc 301    Filed 10/27/09    Entered 10/27/09 16:29:51 Page 2 of 19

claim of about $68,000 for his post-petition lending.[5] The three claims thus currently total about $809,000.[6] The additional borrowing would bring the total to about $909,000, making the Gallegos Construction lien junior to about $650,000 and the Himes lien junior to about $841,000.

Trustee's argument for approval of the borrowing was based on her assertion that the Pond property was worth about $2,500,000. Thus she argued that the junior liens of Gallegos Construction and Himes, to be made more junior by the borrowing, were still fully protected by the considerable equity in the property.[7] And she argued that she could not borrow under any

---

[5] Himes specifically sought to prove up his claim in this proceeding. Trustee objected on the basis that this proceeding was not noticed up for that purpose. The Court reiterates its ruling at trial that the maximum effect of Himes' proof during this trial is that Himes may argue that his claim is established for future purposes by invoking the doctrine of collateral estoppel or issue preclusion. Trustee's position was to argue for the borrowing by granting, only for purposes of the hearing on the borrowing motion, the maximum amount that might be claimed as secured by Gallegos Construction and Himes. The Court adds that it refrained from fully questioning Himes when he was testifying about the returned insurance premium check, particularly concerning the declining daily balances shown for August 7-13 (Himes exhibit 2-3) which led to the "check reversal" on August 13 of the insurance premium check.

[6] During Trustee's testimony, the Court quickly calculated the total as about $801,000, and announced that out loud. Obviously that figure was incorrect, a fact which the parties may have tacitly acknowledged among themselves by not using it during the trial.

[7] The Himes claim is also secured by a first and only lien on the estate's Colfax County real property, a lot in Angel Fire which Himes, as the designated representative of the then debtor

Case 09-10974-trc11    Doc 301    Filed 10/27/09    Entered 10/27/09 16:29:51 Page 3 of 19

better terms.⁸  And she argued there was considerable urgency in obtaining a decision on the motions (hopefully approving them).⁹

**Analysis**

> Section 364(d) of the Bankruptcy Code provides as follows:
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Trustee supported her assertion of value with the testimony and broker's opinion of value (BOV), Trustee exhibit 1, of Leon Mellow, the manager of the Grubb & Ellis real estate office in Santa Fe.  The Court ruled that Mellow could testify as an expert about the value of the three Taos real estate parcels, including

---

in possession, valued at $25m.

⁸ The Court finds the evidence was conclusive on this latter issue; Trustee clearly testified that she could not obtain funding elsewhere that enabled her to go forward with the sale, and Himes did not provide any evidence that the alleged SBSEA lending was a reasonable alternative.  In any event, the Court accepts the testimony of Mr. Aaron, that essentially the SBSEA proposal is a management proposal, not really a funding proposal.

⁹ Ms. Whitten testified that on Thursday, October 29, a payroll was due, and the employees would not work if they were not paid.  This testimony was not really challenged.  Similarly, the challenges to Trustee's urgent need for funds were not even remotely sustained by the questioning of Trustee and her witnesses on the operating reports.

the Pond property, and admitted into evidence the BOV.[10] There was little testimony about the other two Taos parcels (though they were addressed in the BOV) and basically no testimony about the amounts of the liens against the other two parcels, so that in effect the trial mostly centered on the Pond property, its value and the liens against it.

Himes pointed out several deficiencies in the BOV as a whole. It provided no valuation whatever, affirmative or negative, of the medical facility. It did not use the market data approach because Mellow could not find any comparable properties. Overall, the BOV is clearly not an appraisal, which, after stripping out the usual boilerplate, would have had several pages of data and comparative analysis rather than the one page this BOV has.

Concerning the Pond property, only two units were under construction, rather than three, meaning that $16,000 should be deducted from the value. And the miscounting itself calls somewhat into question the accuracy of the BOV as a whole.

---

[10] The Court assumes that, given the short amount of time that Trustee had to come up with evidence of value, she could not obtain an appraisal, and thus had to rely on the BOV. Trustee also pointed out that with the purchase offer from Colinas Health Care, Inc. out on notice (Motion of the Chapter 11 Trustee to Sell Substantially All of the Assets of the Estate Pursuant to 11 U.S.C. §363, doc 292), Trustee was essentially seeking bridge financing until that sale can be consummated in, say, February 2010. Neither of these factors figure into the Court's decision; the borrowing motions and the evidence in support thereof must stand or fall on their own.

Mellow did not go into and inspect the 3600 square foot older home, of a 1930's vintage, which he valued at $100/square foot. He did not find comparable sales. And when he and his team sought comparable data by talking with brokers, what they gathered was offering prices, not completed sales. They did this because they did not have access to the Multiple Listing Service in Taos.

The Court reiterates its ruling pursuant to Fed.R.Evid. 702 that Mr. Mellow qualified as an expert and that his report met the three-part standard set out in Rule 702. An expert's qualifications and the expert's report need not be perfect to be admissible. In re McElroy, 339 B.R. 185, 187 (Bankr. C.D. Ill. 2006) (expert had "the bare minimum of qualifications necessary to be considered an expert [to value vehicles] under Rule 702 of the Federal Rules of Evidence.") . The Court finds that while there certainly are defects in the report, such as the miscounting of the units under construction[11], it still provides a reliable enough guide to value that it will do for these purposes. Were Trustee entering into a contract to purchase the property, an appraisal, and a much closer inspection, would undoubtedly be warranted, to assure the exact dollar figure. But

---

[11] This issue was not raised on cross examination of Mellow. Rather, Himes raised it in his direct testimony, when Mellow had already been excused as a witness and thus was not available to respond to this criticism. The Court assumes that Himes was correct given his role as manager of the property for years.

here the purpose is to obtain a range of value, the lower limit of which will serve as adequate protection for the junior lienholders. As such, the number need not be precise to the dollar so much as it needs to be comfortably more than the amount of all the liens taken together. Additionally, Mellow's testimony was that purchasers in the industry use BOVs to decide what properties to continue to investigate for purchase. Thus a BOV, while not as good as an appraisal, is still useful.

Mellow's reasoning for not adding or subtracting value for the medical facility made sense. Himes, in challenging that decision, suggested that maybe the medical facility was a significant detriment. However, he provided no evidence to support that position. Once Trustee established the admissibility of the BOV and the values it contained, the burden shifted to Himes to come forward with evidence of his own to counter Trustee's evidence. He did not do that concerning the medical facility.

Valuing a home in Taos that members of the Himes family are living in at $100/square foot seems to this Court eminently reasonable if not quite conservative. In so ruling, the Court in effect takes judicial notice of a fact which can easily be established; namely, that residential housing within a few blocks of the plaza is worth at least $100/square foot. Alternatively, Mellow is an experienced real estate broker, albeit much more on

the commercial side, and his opinion that the value of such a property is conservatively worth $100/square foot constitutes evidence of that fact.

Obtaining values by collecting asking prices is certainly less reliable than obtaining agreed to prices. However, it is unlikely that someone asking, say, $2,000 per month for a rental property is likely to accept $500. Thus the asking prices most likely constitute a useful value from which to derive a final albeit smaller number. At the same time, Mellow testified that he had discounted the values for the four completed units, totaling $960,000, and for the home, valued at $360,000, so that those values were not the full retail values.

It certainly would have been more helpful had Mellow and his team been able to find sales of comparable properties. However, Himes pointed out no comparable sales that could have been used, only expressing incredulity instead. This defect in any event is not fatal, since the BOV relies heavily on the income approach for valuation. Mellow's experience and market watching resulted in using a capitalization rate ranging between 10% and 14%. Given that, as he testified, capitalization rates had risen across the country to 9% to 9.5%, selecting a range between 10% and 14% was reasonably conservative, and well supported by the evidence.

Himes also pointed out that the 12 building lots, valued at

$60,000 each, cannot be built on without more serious development work with the city. The Court does not dispute that, but the likely effect of those bureaucratic hurdles is lessened by the successful efforts of Himes himself in obtaining the current status of the lots as building sites.

Finally (and this is not a defect), the BOV itself warns twice that the great amount of deferred maintenance and obsolescence throughout the complex could result in a significant reduction in value. This candid warning gives the Court some concern, and because it is not quantified, the Court has further reduced the overall value of the Pond property because of it.

Taking into consideration all the foregoing, the Court finds that the Pond property has an absolute minimal value of between $1,250,000 (that is, half of the value contained in the BOV) and $1,500,000, and more likely the higher figure. That is, the Court finds that if the Pond property were put up for sale (it is a separate tract from the main campus), it would net at least $1,250,000, and more likely $1,500,000, if not more. So even taking the lower figure of $1,250,000, the $191,000 lien of Gallegos Construction is backed by $409,000 of equity, for a conservative equity cushion of 214%. Himes' $68,000 lien is backed by $341,000, for an equity cushion of 501%. And were Himes lien amount first reduced by, say, $20,000, from the liquidation of the $25,000 Angel Fire property on which Himes as

a first and only lien, the remaining $48,000 lien would be protected by a 710% equity cushion.[12]

In MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393 (10th Cir. 1987), one of the seminal cases on adequate protection, the Tenth Circuit ruled that debtors in possession could use cash collateral to drill new gas wells if debtors delivered to the creditor replacement liens in the well proceeds and other monthly income of the debtors. The court held that adequate protection is a factual matter to be decided on a case by case basis. Id. at 1396-97. The court also ruled that the provisions of §361 do not provide an exclusive list of adequate protection options. Id. at 1396 n. 4.

> In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying

---

[12] The Court recognizes that these calculations are somewhat simplistic, and that a financial expert (or University of Chicago economist) would undoubtedly discount the value of the equity cushions due to lack of "command and control". See In re Campbell Sod, Inc., 378 B.R. 647, 654-55 (Bankr. D. Kan. 2007) (withdrawn from publication because it was intended to be unpublished). For example, how the senior $650,000 lien of Centinel Bank is dealt with could affect how much of the equity cushion turns out to be genuinely and reasonably available to the junior lien holders. It is not as if, for example, Gallegos Construction is in first position on a property worth $841,000. This is doubly true for a small lien at the bottom of the priority ladder, on which lien even marginal or incremental variations in the amount of the senior liens or the value of the collateral can have a hugely magnified effect. Nevertheless, the comparatively large equity cushions in this instance provide sufficient assurance that the Gallegos Construction and Himes lien positions are well protected regardless of what Centinel might do with its much larger senior lien.

> the adequate protection standard. In doing so,
> however, care must be exercised to insure that the
> vested property rights of the secured creditor and the
> values and risks bargained for by that creditor prior
> to bankruptcy are not detrimentally affected.

Id. at 1398. (Citation omitted.) Utilizing this standard, the court declined to reverse the bankruptcy court decision which permitted debtors to use $721,000 of cash collateral in return for a replacement lien on an income stream of $10,000 per month and on the considerable income from the wells to be drilled if they did not turn out to be dry holes. Id.[13]

The objecting parties cite Resolution Trust Corporation v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.), 16 F.3d 552 (3rd Cir. 1994) for the proposition that the prepetition secured creditor (and, in this case, the postpetition secured creditor Himes) must be provided the same level of protection as if there had been no post petition priming lien. The Court agrees with the principle announced and with its application to the facts of that case, in which the debtor sought to provide adequate protection to the creditor by essentially offering it less collateral than it already had and by subjecting

---

[13] It is true that Trustee's plan is a liquidating plan – sell the operation – rather than reorganization, and beyond that, Trustee seeks to sell the operation even without a plan. Nevertheless, the underlying principle remains the same: all creditors - administrative, priority, secured, unsecured – stand to benefit more quickly from a sale rather than a potential foreclosure and closing of the facility, if the sale does not go through and neither plan is confirmed.

the creditor to the risks of the reorganization. "Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." Id. at 567. The considerable equity cushion in this case distinguishes it from Swedeland Development.

The objecting parties also cite In re Mosello, 195 B.R. 277 (Bankr. S.D.N.Y. 1996) for the proposition that, as Campbell Sod, 378 B.R. at 653, points out, a finding of adequate protection must be based on a firm factual predicate. 195 B.R. at 292 (denying motion for priming loan based on lack of any facts showing that primed creditor would become anything but an unsecured creditor as a result[14]). As with Swedeland Development, the principle is correct and was correctly applied by the New York court to the facts of that case, but the facts of the Mosello case differ radically from the facts in this case.

Gallegos Construction argues that by virtue of the Fifth Amendment to the United States Constitution, its lien cannot be

---

[14] Stated concisely, the debtors' position is that expenditure of the MAC loan proceeds to develop the Thornwood Property will result in an increase in value of the Property greater than the amount of the loan, and that this increase in value alone constitutes "adequate protection" in compliance with section 364(d)(1)(B).
Id. at 288.

Page 12 of 19

primed at all without a replacement lien in other collateral, or a cash payment.  Gallegos Construction argues that an equity cushion, no matter how large, is completely impermissible, reasoning that priming its lien takes something away from it, thereby diminishing it, which can only be done if Gallegos Construction is compensated.  While it is certainly true that the United Supreme Court has interpreted the Constitution to require that property rights such as liens be carefully respected, it has not thereby made property liens completely inviolate.  E.g., Wright v. Union Central Life Ins. Co., 304 U.S. 502, 518 (1938) ("Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected.  But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed.").  What Gallegos Construction is entitled to is not a lien frozen in time and place but rather payment of its debt, and the assurance that its lien can and will result in payment.  Thus an equity cushion can suffice as adequate protection for a borrowing motion (assuming the cushion is sufficiently large).  Campbell Sod, 378 B.R. at 653, citing In re Stanley Hotel, Inc., 15 B.R. 660, 664

(D.Colo. 1981).[15] Indeed, the entire premise of a case such as <u>United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.</u>, 484 U.S. 365 (1988) (adequate protection and reorganizability in §362 context) is that a claim (under)secured[16] by a lien can be denied "realization ... of the indubitable equivalent" of the collateral until confirmation. <u>Id.</u> at 377. Gallegos Construction conceded that that was the case for liens in a §362 context but not for liens in a §364 context. Gallegos Construction provided no case law in support of that distinction and contrary to <u>Campbell Sod</u>. And the Court finds nothing in §§361-365 of the Code, which deal with liens and adequate protection in various contexts, upon which to base such a distinction.

Appropriately, neither objecting party has argued that the priming lien will cause the loss of "command and control". <u>See</u> <u>Campbell Sod</u>, 378 B.R. at 654-55. That is because Centinel has always had the senior lien position, and thus continues to have

---

[15] As noted in the earlier footnote, <u>Campbell Sod</u> was withdrawn from the bound volume of the West Bankruptcy Reporter because the court that decided it did not want the case to be published. However, that does not prevent this Court from using it anyway, based on the common sense and clear reasoning that the opinion contains in addressing a similar borrowing motion.

[16] Obviously the objecting parties' liens differ from those in <u>Timbers of Inwood</u>, in that they are oversecured. But the Court cites <u>Timbers of Inwood</u> for the proposition that liens are not completely inviolate under the Constitution or the statute, contrary to the argument of Gallegos Construction.

Page 14 of 19

Case 09-10974-trc11    Doc 301    Filed 10/27/09    Entered 10/27/09 16:29:51    Page 14 of 19

the command and control that lenders find so desirable.

The objecting creditors also vigorously argued that there had been inadequate notice of the relief being sought, and that the requirements of Fed.R.Bankr.P. 4001(c) and NMLBR 9013-1 had not been met. The Court finds that these objections are not well taken.[17]

First, the Court agrees that the notice was not nearly as good as it might have been. Nevertheless, taking the motion (doc 247) and the amended motion (doc 264) together, Trustee has met the requirements of providing adequate notice to the objecting parties. Reading the first motion which was filed under §363(c) and included the BOV, all creditors were effectively put on notice that Trustee wanted to borrow $200,000 under fairly onerous terms, that she valued the Pond property at $2,500,000, that she wanted to prime Gallegos Construction and Himes (¶5.5, at page 2) – effectively asking for §364(d) relief - and that she was unable to obtain credit solely as an administrative expense. Doc 247. The follow-up motion, doc 264, was not noticed out to the creditor body as a whole, but it asked for only half the amount sought by the first motion. Since from the perspective of unsecured creditors, it should make little difference where the lien was placed on the estate's collateral, and it would benefit

---

[17] The Court orally ruled on the morning of October 23 that the borrowing motion did not need to be, or to be accompanied by, an adversary proceeding.

them in a general sense if Trustee borrowed only half of what she had asked for originally, there was no need renotice the creditors as a whole about the change. As to Gallegos Construction and Himes, the inclusion of the BOV with the first motion and the specification in both the first and second motions that the priming lien would be placed on the Pond property served as sufficient notice (if only barely) that Trustee sought a ruling that the equity cushion would provide adequate protection to junior liens. The concept of an equity cushion is a commonplace in bankruptcy, and clearly Trustee was not offering any other form of adequate protection. Thus it should have occurred to both objecting parties that they should be prepared to argue the issues of equity and equity cushion, and in fact Gallegos Construction did recognize it. Doc 273, ¶ 11 at page 4.

Fed.R.Bank.P. 4001(c) sets out a detailed list of items to be included in borrowing motions under §364(c) and (d), including among others a copy of the credit agreement and a form of proposed order. The motions were filed on September 17 and October 1 respectively, and the objections concerning non-compliance with the rules was raised for the first time at trial on October 22.

The credit agreement did not exist at the time (and apparently still does not); rather, the parties essentially incorporated a term sheet into the motion itself. No proposed

form of order was attached either; clearly Trustee and Centinel are awaiting this Court's ruling before submitting such a draft order.  And the motions, especially the amended motion, did not set out the details of the various liens, their amounts and priorities, etc.  The considerable lacunae in the motions and the notice were obvious to both objecting creditors, yet neither of them raised the issue in either of the objections that either of them filed.  Presumably they did not object because they were well aware of the various parties' lien positions on the Pond property and therefore in effect did not need to be told that kind of information.  Whatever the reason, however, their failure to promptly raise the issue of noncompliance with Rule 4001(c) precluded Trustee from being aware that the non-compliance would be an issue and thus from fixing the problem timely with a second amended motion.  Clearly Trustee, who has the burden of proof on the issue of adequate protection, also has the burden of complying with the rules to the extent needed to ensure the issue is raised sufficiently to be fairly contested.  The Court has already ruled that the issue of the equity cushion as adequate protection was sufficiently noticed to the objecting parties; the failure to object in writing to the non-compliance with the rules bespeaks the knowledge of the objecting creditors of the other background details that the rules are designed to provide to creditors not already in the know, and effectively constitutes a

waiver.  Although the Court certainly does not condone failing to comply with the rules generally, in this case it appears that no one who might genuinely claim to be harmed is objecting.  Perhaps this is because the details that the rule requires, including the form of the order and the credit agreement, suggest that a relatively simple borrowing motion such as this was not the target of the rules.  Regardless, the Court cannot find that the objecting creditors were materially prejudiced in contesting the relief requested, and therefore the Court will grant the requested relief over these objections raised for the first time at trial.[18]

**Conclusion**

Trustee has made a (barely) sufficient showing that she has complied with §364(d) and with the notice requirements to obtain the requested relief.  The Court will enter an order approving the borrowing from Centinel Bank on the terms set out in the motion (doc 264).  Trustee's counsel shall submit a form of order approved as to form by counsel for Gallegos Construction, Himes, Centinel Bank and any other party who attended the hearing and

---

[18] NMLBR 9013-1(a) provides as follows:
    **Form of Motions**.  The title of a motion shall describe the relief sought.
Both motions were clearly denominated borrowing motions under §364; this is sufficient to comply with the rule.  The objection that the motions do not say they are asking for stay relief is accurate, but the objection, raised at trial for the first time, is too late, and in any event does not identify any material harm to an objecting party.

wishes to sign off.

/s/ James S. Starzynski
James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket: October 27, 2009

COPY TO:

Linda S. Bloom
Trustee
PO Box 218
Albuquerque, NM 87103-0218

Chris W Pierce
Hunt & Davis, P.C.
P.O. Box 30088
Albuquerque, NM 87190-0088

James A Askew
PO Box 1888
Albuquerque, NM 87103-1888

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Thomas D Walker
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

Clifford C Gramer, Jr
3733 Eubank Blvd NE
Albuquerque, NM 87111-3536

Alice Nystel Page
PO Box 608
Albuquerque, NM 87103-0608

Walter L Reardon, Jr
3733 Eubank Blvd NE
Albuquerque, NM 87111-3536

Nathan C. Sprague
PO Box 27047
Albuquerque, NM 87125-7047